# UNITED STATES of America, Appellant,

## v.

## David P. BAIRD.

### No. 87–3050.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 28, 1988.

Decided June 24, 1988.

---

Elizabeth H. Danello, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellant.

David Kagan–Kans, Madison, Wis., (appointed by this court), for appellee.

Before EDWARDS, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The United States appeals a district court order suppressing evidence obtained from appellee, a U.S. Coast Guard officer, during an interview with a Department of Transportation investigator. The court held that because of the element of military compulsion surrounding the interview, it constituted a custodial interrogation requiring *Miranda* warnings. The court also held that the confession was involuntary considering the totality of the circumstances of the interview. Because we find that the circumstances did not rise to the level of custodial or coercive interrogation, we reverse and remand.

## I. BACKGROUND

David Baird is a lieutenant commander in the United States Coast Guard Reserve. He has been charged under 18 U.S.C. § 203(a) (1982 & Supp. IV 1986) with receiving compensation, while on active duty, from a private corporation in exchange for his assistance in obtaining a contract from the Coast Guard. In the course of an interview, Baird made compromising statements that the district court ordered suppressed after an evidentiary hearing.

As the Department of Transportation ("DOT" or "Department") has jurisdiction over the Coast Guard, the investigation was conducted by the Department's Office of the Inspector General ("OIG"). An investigator from one of OIG's regional offices, Special Agent Jonathan Armenta, was directed to interview Baird. Armenta decided to do so at the Coast Guard base in New Orleans, Louisiana, to which Baird was assigned.

The relevant facts, as summarized in the district court's opinion, are as follows. On the day of the interview, Armenta contacted the District Commanding Officer, Commander Schaeffer, in order to arrange for the interview. Armenta informed Schaeffer that he wished to interview Baird in connection with an official investigation into Baird's activities. Schaeffer telephoned Baird's immediate superior and directed him to tell Baird to go to an unoccupied office. Armenta and Schaeffer proceeded to the office and were awaiting Baird when he arrived.

At the suppression hearing, Agent Armenta provided the following description of Commander Schaeffer's participation in the interview:

Q. [by the Assistant U.S. Attorney] Tell us everything you recall that the Commanding Officer [Schaeffer] said to David Baird, from the time David Baird came into the room to the time that the Commanding Officer left.

A. [by Armenta] After the introduction—

Q. Tell us the introduction. The introduction—

A. "Special Agent John Armenta, this is Lt. Commander David Baird." We shook hands, said "How are you," and Commanding Officer Schaeffer said, "Special Agent Armenta here has a few questions to ask you."

And after that [Schaeffer] asked me, "Do you need me for anything else?"

. . . .

Q. "Do you need me for anything else?"

A. "Do you need me for anything else?" I said "No." "You want me to stay in the interview?" I said "No, this is going to be a one-to-one interview."

He said, "Well, OK. If you need me get ahold of me." And that's all. He just left.

Transcript of Suppression Hearing ("Tr.") at 39–40. No other witnesses testified at the suppression hearing about the facts surrounding Schaeffer's participation in the interview. In reviewing this testimony, the district court noted that, aside from the introduction, Schaeffer addressed all of his remarks solely to Armenta.

After Schaeffer left, Armenta began by advising Baird of the purpose of the interview. At the same time, he stated "that the interview was going to be voluntary," and that Baird "was free to go whenever he wanted to." Tr. at 10. Baird stayed and made statements giving rise to the charge.

At the outset of its opinion denying reconsideration of its decision to suppress Baird's admission, the district court noted that

[t]he prosecution may not use in its case-in-chief statements stemming from custodial interrogations of the defendant that result from any type of government coercion sufficient to deprive the accused of his freedom to exercise his constitutional right to silence.

*United States v. Baird,* Cr. No. 87–76, Opinion denying recons. at 2 (D.D.C. Aug. 19, 1987) ("Opinion") [available on WESTLAW, 1987 WL 16552].

The court found that the circumstances surrounding the interview had given rise to a custodial interrogation requiring that

Baird be given *Miranda* warnings. It also found that the situation would cause a reasonable military officer to feel coerced by "'subtle pressure created by rank or duty'" to cooperate with Armenta. Opinion at 5 (quoting *United States v. Kruempelman*, 21 M.J. 725, 726 (A.C.M.R.1985)).

The court also observed that it was because of these "pressures exerted by the chain of command, and by a military officer's conditioning to follow all but the most obviously illegal orders," that the Uniform Code of Military Justice ("U.C.M.J.") establishes special protection for military suspects. Opinion at 5 & n. 3. Thus Article 31 of the U.C.M.J. requires that *Miranda* –type warnings be given whenever a military suspect is interrogated during a military investigation, whether the suspect is in custody or not. U.C.M.J. Article 31(b), 10 U.S.C. § 831(b) (1982). If such a warning is not given, the evidence obtained is excluded from any court-martial proceeding. U.C.M.J. Article 31(d).

Because of these special factors, as amplified and interpreted by appellee's expert witness on military law, Commander Thomas W. Snook, U.S.C.G., the court decided that Armenta "use[d] the chain-of-command to produce the defendant and implicitly inform him of what was expected from this junior officer in the 'interview.'" Accordingly, it found "both the 'custody' that gives rise to the need for *Miranda* warnings and the 'coercion' that prevents prosecutorial use of a suspect's incriminating statements." Opinion at 7. The court specifically rejected the notion that Armenta's assurances to Baird that the interview was voluntary, and that he was free to leave, were in themselves sufficient to negate his Commanding Officer's implicit order to cooperate with the investigation. *Id.* at 7–8.

On appeal, both parties focus on the district court's findings regarding custody and coerciveness; and in supplemental briefs requested by the court, they examine the possible application of Article 31 and its exclusionary rule.

## II.  DISCUSSION

Although, in its decision, the district court combined the issues of custody and coercion, we will address them separately. First we consider the standard by which we review the district court's determinations of custody and coercion. We then examine each of the issues in turn, and find neither the custody nor the coercion required to support a suppression order. As no military investigation occurred, we find the Article 31 exclusionary rule inapplicable to this case.

### A.  The Standard of Review

#### 1.  *The Miranda Determination*

In this case, the facts and circumstances surrounding Armenta's interview of Baird are not in dispute. The question is whether those facts support the court's determination that Baird was effectively in custody. This is a legal question that we review de novo. *See United States v. Robinson*, 533 F.2d 578, 580 (D.C.Cir.1976) (en banc).

#### 2.  *Determination of Voluntariness*

As the Supreme Court recently confirmed in *Miller v. Fenton*, "the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination." 474 U.S. 104, 110, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985). The Court acknowledges that findings concerning "subsidiary questions, such as the length and circumstances of the interrogation," are conclusive "if fairly supported in the record"; but having said this, the court reaffirms that

> once such underlying factual issues have been resolved, and the moment comes for determining whether, under the totality of the circumstances, the confession was obtained in a manner consistent with the Constitution, the state-court judge is not in an appreciably better position than the federal habeas court to make that determination.

*Id.* at 117, 106 S.Ct. at 453.

Although *Miller* involved an appeal from a state-court finding in a federal habeas corpus proceeding rather than, as in this case, an appeal from the decision by a federal district court to suppress a confession, the *Miller* rule clearly applies to this

case. Thus we review the issue of voluntariness de novo.

## B. Military Orders as Constituting Custody

The Supreme Court has provided the following test for determining when custody exists of the kind requiring *Miranda* warnings: "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)).

*Beheler* involved an accused who voluntarily accompanied the police to the station house after the police had found a murder weapon in his yard. The police informed him he was not under arrest, and *Miranda* warnings were not given. Beheler was emotionally upset, had been drinking, and talked to the police about the murder for thirty minutes. Five days later he was arrested, given *Miranda* warnings, and made a second confession. Neither the fact that the first interview took place at a station house, nor the fact that the accused was already a suspect, were sufficient to create a custodial situation requiring *Miranda* warnings.

In *Oregon v. Mathiason,* the accused voluntarily came to a state police patrol office. An officer took him to an office, closed the door, and informed him that he was not under arrest. The officer falsely stated that the accused's fingerprints were found at the burglary site. The accused confessed within five minutes of arriving at the patrol office. The Supreme Court again emphasized that interviews conducted in a police station did not establish, without more, an environment amounting to custody.

In another recent case, *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), a probationer confessed to an earlier crime in answer to a question posed by his probation officer. The Court held that although Murphy was under an obligation to meet with the probation officer and to answer questions truthfully, this "did not in itself convert Murphy's otherwise voluntary statements into compelled ones." *Id.* at 427, 104 S.Ct. at 1142.

It is against the backdrop of these three cases, *Beheler, Mathiason,* and *Murphy,* that we now examine the district court's conclusion that the direct and implied orders given Baird by his commanding officer had the effect of placing him in custody within the meaning of *Miranda.*

■ In reaching its position, the district court focused on three factors: Baird was ordered to appear; Schaeffer's limited introduction implied that Baird should remain with Armenta until the interview was completed; and Armenta's indication that Baird was free to leave was insufficient to override Schaeffer's implied order to remain.

The court found that Baird was ordered to appear for the interview. Armenta agreed to this characterization of Schaeffer's actions, Tr. at 26–29, as does appellant. Reply Brief for Appellant at 5. Such an order implies a duty to cooperate in the proceedings that one is ordered to attend. Therefore, although Baird did not know why he was being summoned, we agree that he would feel obliged by his commanding officer's order to remain with Armenta as long as he was needed.

We do not agree, however, with the court's conclusion that the implied instruction, coupled with Schaeffer's parting request that Armenta let him know if he were needed "for anything else," was sufficient to support a finding of *Miranda*-type custody. Schaeffer did nothing more than place Baird at Armenta's disposal; and the circumstances of the military environment and military habits of obedience notwithstanding, we see nothing to support an inference that Baird was under an obligation to ignore the investigator's explicit assertion that the interview was voluntary, and that Baird was free to leave when he chose. Certainly, the situation in which Baird found himself fell far short of the " 'restraint on freedom of movement' of the degree associated with a formal arrest"

that the Supreme Court established, in *Beheler,* as the standard for a finding of custody.

We take seriously what Article 31(b) of the U.C.M.J. implies about the special conditions created by the discipline of military life. We do not doubt that Congress acted wisely in creating a presumption of custody requiring the equivalent of *Miranda* warnings whenever a military suspect is caught up in a "chain-of-command" interrogation by military investigators. Here, however, the investigation did not concern a military offense, and it was conducted not by the Coast Guard but by the civilian agency that has full jurisdiction *over* that service.

The nature of the Department's authority, and its significance in the context of this case, were made apparent in the following extract from the cross-examination of appellee's expert witness, Commander Snook:

Q. [by Assistant U.S. Attorney Robert G. Andary] And [Agent Armenta] is not empowered to order a person in the military to do anything, is he?

The Court: Do you know that?

The Witness: I disagree with that.

By Mr. Andary:

Q. OK. Could you explain?

A. Well, we work for the Department of Transportation. They have civilian control over the military. I have taken orders from representatives of the public transportation. I would certainly caution anybody and admonish people that yes, they have to comply with orders from the Department of Transportation.

Q. Does the person giving the order, though, have to be in the chain of command?

A. Not necessarily. I mean I think in the military that if you have investigators, special agents, they have certain authority, so that—I mean, obviously, you are not going to take orders from a file clerk, but you would take directives from somebody who you would assume had the authority.

Q. OK, sir.

The Court: And a special agent of the [DOT's] inspector general's office would be one whom you would "assume had proper authority."

The Witness: Yes, your Honor.

Tr. at 55–56.

In light of this exchange, we do not accept the district court's reasons for concluding that Armenta's statements did not "transform [the] inquiry into a non-custodial, non-coercive period of questioning": namely, that Armenta was outside Baird's chain-of-command, Schaeffer had effectively ordered Baird to remain and cooperate, and Armenta had given his assurances only after Schaeffer had left the room. Opinion at 8.

Schaeffer had indicated only a limited interest in the interview. He did not issue a direct order to Baird to stay for the entire interview regardless of its nature. At most, Schaeffer indicated that Baird should remain until Armenta no longer needed him. Schaeffer's offer of further assistance may have served to underscore Baird's duty to cooperate with Armenta, but it in no way limited the agent's authority to conduct the interview as he saw fit. It is relevant that *Armenta* decided that Schaeffer would not be present. Any reasonable officer would conclude that Armenta controlled the terms of the interview, and there is no reason why Baird should not have felt free to take his assurances at face value.

Nor was it necessary that Schaeffer be present to validate Armenta's assurances. As Commander Snook confirmed, although Armenta stood outside the chain-of-command, he had the authority to establish the rules governing the interview. Even so, there was no conflict between his directions and those given by Schaeffer. Schaeffer's order: "Special Agent Armenta here has a few questions to ask you" did not conflict with Armenta's statement to Baird: "You are free to go." Armenta had the authority to set the rules of engagement.

The facts in this case parallel those in *Murphy* in significant ways. The Supreme Court there rejected the argument that four factors supported a finding of custody: the probation officer could compel

Murphy's attendance and truthful answers, the officer sought incriminating evidence, Murphy did not expect to be questioned about prior criminal conduct, and there were no observers to guard against trickery by the probation officer. 465 U.S. at 431–33, 104 S.Ct. at 1144–45.

In the present case, most of the factors are the same. The Court noted, in *Murphy*, that the suspect was familiar with parole office procedures whereas in *Miranda*, the suspect's unfamiliarity with the interrogating officers contributed to the coercive nature of the custody. *Id.* at 433, 104 S.Ct. at 1145. Baird had had no prior contact with Armenta. Armenta's clear statement that Baird could leave at any time, however, dispelled any element of compulsion that might have resulted from Baird's unfamiliarity with Armenta and the OIG's internal investigation procedures.

Even more important, *Murphy* concluded that "the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained." *Id.* (citing *Miranda v. Arizona*, 384 U.S. 436, 468, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966)). In this case, Baird was assured at the outset that he could terminate the interview at will.

As we conclude that the circumstances surrounding Baird's interview, taken as a whole, did not constitute custody within the meaning of *Miranda*, Armenta was not obliged to warn him of his constitutional rights. Nevertheless, we fault Armenta for having failed to do so. DOT investigators are aware of the ambiguous position of Coast Guard officers. Baird was the obvious target of the inquiry, and these costly proceedings could have been avoided had Armenta taken the precaution of giving prophylactic *Miranda* warnings even though, as we have determined, they were not constitutionally required.

C. The Voluntariness of Baird's Confession

Having concluded that Baird was not in custody (and hence not subject to a custodial interrogation, *Murphy*, 465 U.S.

at 433, 104 S.Ct. at 1145), we now decide whether he had been subjected to coercive conduct that caused him to make an involuntary confession. Supreme Court cases involving the voluntariness of confessions

> have focused upon the crucial element of police overreaching. While each confession has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

*Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). Among the examples of overreaching cited by the Court are the following: Four-hour interrogation while the accused was incapacitated and sedated in an intensive care unit, *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); eight hours of intense interrogation in a small, crowded room despite police's knowledge of suspect's history of mental problems, *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); interrogation of suspect known to have been administered a drug with truth-serum properties, *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

The district court based its finding of coercion on two factors: First, "Baird was ordered by his superior officer [Schaeffer] to appear at the interview"; and second, Schaeffer "deferred to the Special Agent and made himself available, for the purposes of the investigation, whenever Special Agent Armenta—but not Lieutenant Commander Baird—needed him. This," the court concluded, "is not merely 'subtle pressure,' but the use of the chain of command to produce the defendant and implicitly to inform him of what was expected from this junior officer in the 'interview.' " Opinion at 6–7.

The court properly recognized that "a member of the military will feel coercion in circumstances in which a civilian would not." Opinion at 6. The question before

us, however, is whether under the particular circumstances of *this* case, the effect of Schaeffer's and Armenta's conduct "was such as to overbear [Baird's] will to resist and bring about confessions not freely self-determined." *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961).

We find nothing in the record to support such a conclusion. Even if we were to accept the Pavlovian implications of the court's assertion that military officers are "condition[ed] to follow all but the most obviously illegal orders," Opinion at 5, the most that can be made of Schaeffer's remarks and conduct is that they constituted an order to cooperate with Armenta. This left Armenta in a position to define the scope of cooperation, which he did by indicating that the interview was voluntary and that Baird was free to leave.

The district court discounted the weight to be given Armenta's statements, but in doing so (as we indicated in our discussion of the question of custody), the court ignored the particular deference given by the Coast Guard and its officers to orders and directives issuing from the Department of Transportation. Thus, unlike the district court, we find that the government has met its burden of establishing, by a preponderance of the evidence, that Baird's statements were voluntary. *Connelly*, 107 S.Ct. at 523.

The order given Baird by his commanding officer was neither more nor less than to cooperate fully with Armenta. As Armenta was acting in an official capacity on behalf of the Department of Transportation, he both had the authority, and would have been perceived by Baird as having the authority, to define the conditions of the interview. Therefore, as we stated above, Armenta's assertions that the interview was voluntary in no way conflicted with Commander Schaeffer's instructions as they would have been understood by Baird.

D. U.C.M.J. Article 31 Restraints on Military Investigations

■ Article 31(b) of the U.C.M.J. requires an investigator, before questioning an accused or suspect, to inform the suspect of the nature of the offense, advise him that he need not make any statement regarding the offense, and inform him that should he make a statement, it may be used against him at a trial by court-martial. 10 U.S.C. § 831(b) (1982). The protections of Article 31(b) are broader than *Miranda* warnings in that a suspect must receive warnings even if the suspect is not in custody. *United States v. Foley*, 12 M.J. 826, 831 (N.M.C.M.R.1981). *Cf. Miranda*, 384 U.S. at 477–78, 86 S.Ct. at 1629–30. Article 31(d) provides that statements made by a person who has not been advised of his Article 31(b) rights may not be "received in evidence against [the suspect] in a trial by court-martial." 10 U.S.C. § 831(d) (1982).

■ Although Article 31(b) states that warnings need be given only if the investigator is a "person subject to [the U.C.M.J.]," 10 U.S.C. § 831(b) (1982), military court case law makes clear that the warnings must be given to a military suspect by any interrogator, whether military or civilian, involved in military investigations. *United States v. Kellam*, 2 M.J. 338, 341 (A.F.C.M.R.1976). Civilian investigators must give these warnings in at least two circumstances: (1) when civilian and military investigations are ongoing and the "scope and character of the cooperative efforts demonstrate 'that the two investigations [have] merged into an indivisible entity,'" *id.* at 341 (quoting *United States v. Swift*, 17 C.M.A. 227, 232 (1967)); and (2) when the civilian investigator acts as the military's instrument, *Kellam*, 2 M.J. at 341 (citing *United States v. Grisham*, 4 C.M.A. 694, 697 (1954)).

Baird argues that the investigation in his case fits into the first category: a merger of military and civilian investigations. He bases his argument on the fact that although DOT is a civilian agency, it controls the Coast Guard, which is a military service. Baird also reasons that the DOT–OIG investigation could have resulted in a criminal prosecution either for a violation of DOT conflict-of-interest regulations, or for a violation of military law under Article 134 of the U.C.M.J., 10 U.S.C. § 934 (1984).

Article 134 is the "catch-all" provision of the U.C.M.J. that allows the military to punish a variety of unenumerated offenses, such as "crimes and offenses not capital of which persons subject to this chapter may be guilty." *Id.* Baird argues that because he could have been charged under the U.C.M.J., the DOT–OIG inquiry should be considered a merged civilian-military investigation. Therefore, he should have received Article 31(b) warnings; and as they were not given, use of his statements is precluded by Article 31(d). The Department, however, assured the court that the investigation was not merged, and we see no indication in the record of a parallel military inquiry that might support an inference to the contrary. Accordingly, we conclude that Baird was not entitled to the protection of Article 31. We express no opinion as to whether there are circumstances under which the exclusionary rule of Article 31(d) might apply to civilian trials. *See United States v. Newell,* 578 F.2d 827, 835 (9th Cir.1978).

### III. CONCLUSION

Having concluded that the circumstances surrounding the interview of Lieutenant Commander Baird did not rise to the level of custodial or coercive interrogation, we reverse the district court and remand for further proceedings.

*So ordered.*